RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RAYMOND L. GEIGER,

*Plaintiff-Appellant,*

No. 08-1314

*v.*

TOWER AUTOMOTIVE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 06-13633—Thomas L. Ludington, District Judge.

Argued: May 1, 2009

Decided and Filed: September 4, 2009

Before: KENNEDY, GIBBONS, and ROGERS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Richard A. Meier, LAW OFFICE, Farmington Hills, Michigan, for Appellant. Philip B. Phillips, FOLEY & LARDNER LLP, Detroit, Michigan, for Appellee. **ON BRIEF:** Richard A. Meier, LAW OFFICE, Farmington Hills, Michigan, for Appellant. Philip B. Phillips, Jennifer L. Neumann, FOLEY & LARDNER LLP, Detroit, Michigan, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which KENNEDY, J., joined. ROGERS, J. (p. 16), delivered a separate opinion concurring in the result.

———————————

## OPINION

———————————

JULIA SMITH GIBBONS, Circuit Judge. Raymond Geiger appeals the grant of summary judgment to Tower Automotive ("Tower") on his employment discrimination claims pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws

1

§§ 37.2202 *et seq*.  The United States District Court for the Eastern District of Michigan found that Geiger failed to make a *prima facie* showing of age discrimination under either federal or state law and entered judgment as a matter of law for Tower.

For the reasons set forth below, we affirm the judgment of the district court.

**I.**

The facts of this case arise from Geiger's termination from his employment at Tower. Geiger, born in 1943, worked as a Maintenance, Repair, and Operations ("MRO") Buyer for Tower's Elkton plant.  He was employed as an MRO Buyer in 1998 and worked until his termination on November 11, 2005, when he was 62 years old.  Ellen Moorman, the human resources manager, testified that Tower reduced the number of employees at the Elkton plant from 122 positions in 2000 to 61 positions in 2006.  Most of these reductions took place because of downsizings.  In 2005, Tower filed for bankruptcy, which further increased the need to eliminate positions.  According to Alfred Buycks, the director of MRO purchasing, the president of Tower decided to centralize the purchasing responsibilities in light of the bankruptcy.  Buycks stated that the vice-president of Tower instructed him to eliminate 15 buyer positions, reducing the staff from 21 buyers to 6.  While the 21 buyers had each been assigned to a single facility, the 6 consolidated buyer positions would be responsible for geographic regions.  As a result, Geiger's position at the Elkton facility was eliminated, and a single new position was created with responsibility for both the Elkton and Clinton facilities.  Buycks, in consultation with his superior and with human resources, made the hiring decisions for the new buyer positions.

Geiger remembers learning of this planned centralization at some point in May of 2005.  Buycks drafted an organizational chart around the beginning of May of 2005 with potential reassignments, listing Belinda Strong[1] as the MRO Buyer for the Elkton and Clinton facilities.  Buycks allegedly modified this chart on May 13, 2005, by adding phone numbers of several of the employees, including Strong, to the chart.  Buycks testified that he had not made any hiring decisions at that point and that the draft

---

[1]The 2005 draft chart lists Strong by her previous name of Belinda Cottick.  This opinion will refer to her by her current name, Belinda Strong.

represented only "brainstorming." The fact that other individuals shown slated for the position were not actually chosen supports Buycks's testimony. On May 13, 2005, employees received an internal email notifying them that Tower would centralize many positions, including buyer positions.

Sometime during the early summer of 2005, Geiger alleges that his supervisor and materials manager Mike Rokicki arranged for Kevin Truemner, a younger employee, to receive training pertinent to Geiger's job and suggested that Geiger take a voluntary layoff for the one-week duration of the training. Geiger claims that this happened because "Mr. Rokicki thought [Geiger] was considering retirement and that he felt [it was] in the best interest of the Elkton business unit that he should have that role covered by a younger person." (Geiger's Dep. at 44.) Geiger was not considering retirement and complained to his immediate supervisor, Mike Murphy. Geiger was ultimately allowed to attend the training session instead of the younger employee.

Tower produced a spreadsheet which listed the current MRO Buyers and also listed six MRO Buyer positions to be reduced. Geiger was one of the six "[c]andidates for reduction." Shortly after this spreadsheet was generated, Buycks encouraged all MRO Buyers to apply for one of the new MRO Area Buyer positions. He believes he contacted all of the MRO Buyers individually to encourage them to apply, but he does not remember speaking with Geiger. Geiger claims that he was never contacted. Strong says that she was personally contacted and encouraged to apply, although Buycks does not remember this conversation either. Based on this sequence of events, Geiger claims that he was not seriously considered for the job.

Murphy assisted Geiger in filling out the online application for the job, but Tower claims that it never received his application. Nevertheless, both Geiger and Strong were interviewed for the position. On July 8, 2005, Linda Kreuter, the manager of human resources, sent Buycks an email, instructing him that he "should plan to contact the current plant MRO Buyers to make sure they are aware of and apply for the positions and talk with them personally about the role." Another version of the same email, presumably the original version of the email, was found during discovery and

stated that Buyck "should plan to contact those MRO buyers *that you want* to make sure apply for the positions and talk with them personally about the role" (emphasis added). The district court permitted Geiger to depose Kreuter about the alteration, and the parties provided supplemental briefing on the issue. Kreuter stated in her deposition that she did not recall changing the email, nor did she know how it was changed. It is unclear who altered this email, when the alteration occurred, or why. Geiger claims that the alteration indicates Tower's intention to cover up its illegal age discrimination against him.

In September of 2005, Buycks offered Strong the position, and she accepted. Buycks explained that he chose Strong because of her "systems and computer skills, being a team player, having a full understanding of MRO materials at her plant, and . . . also her interpersonal skills, dealing with upper leadership." (Buycks's Dep. at 48.) He further explained that although Geiger was a hard and dedicated worker, "some of his skill sets weren't as up-to-date . . . [w]hen it comes to systems, Power Point, Excel, things of that nature." (Buycks's Dep. at 49-50.) Buycks also stated that Strong's interpersonal skills were more impressive than Geiger's. Cannon interviewed both candidates and recommended Strong for the position, saying that he was impressed by Strong's performance at the Clinton facility, particularly the policies and procedures she implemented. Murphy, Geiger's immediate supervisor, stated that Geiger was a "good employee" and performed to his expectations, although his time management skills and organizational skills were "not excellent." (Murphy's Dep. at 8.) According to Buycks, age played no role in his decision to hire Strong.

On November 11, 2005, Geiger's employment was terminated. Moorman stated in her deposition that no one was hired to replace him, and his former responsibilities have been distributed among hourly union employees. Geiger claims that he was the only person who was not reassigned to another position within Tower after the centralization. Geiger filed a complaint in the United States District Court for the Eastern District of Michigan, alleging age discrimination in violation of the ADEA and the ECLRA.

During the course of discovery, Geiger found two additional documents and a comment made during a deposition that he claims further indicate that he was terminated on account of his age.  First, meeting notes from an "MRO Centralization Meeting" list Rokicki as having concerns that Geiger might file an age discrimination suit against Tower.  Specifically, the notes state:  "Ray Geiger has been identified as potential [reduction in force].  [Rokicki] is concerned with age discrimination issue he will follow up with [human resources]."  Second, in response to an email from Cannon regarding the fact that an employee leaked the information that Geiger's employment was going to be terminated, Rokicki stated:  "Just a FYI.  I'm still sticking with the Friday plan [to terminate Geiger], although [Geiger] will probably be fishing for info from me later today. . . .  P.S. I just cannot shake this feeling that we're doomed!"  Third, in her deposition, Moorman was asked why a document had Geiger listed as laid off rather than terminated.  She responded, "I maybe made a boo-boo."

Tower filed a motion for summary judgment.  After hearing argument, the district court granted the motion, finding that Geiger had not established a *prima facie* case of age discrimination under the heightened standard applicable to work force reductions. The district court found that Geiger had not provided evidence to challenge Tower's proffered reason that his discharge was due to Tower's work force reductions.  Geiger filed a motion for reconsideration, which was denied by the district court.  *Geiger v. Tower Auto.*, No. 06-13633-BC, 2008 WL 544958, at *2 (E.D. Mich. Feb. 25, 2008). Geiger timely appealed to this court.

## II.

We review a district court's grant of summary judgment *de novo*.  *See Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008).  Summary judgment should be granted when the moving party can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the moving party has met its burden, the nonmoving party must demonstrate an essential element of its claim to defeat the motion for summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the nonmoving party

cannot provide enough evidence that a reasonable jury could find for it, the motion for summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**A.     ADEA**

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* In *Gross v. FBL Financial Services, Inc.*, the Supreme Court recently emphasized that with both direct and circumstantial evidence, the burden of persuasion remains on ADEA plaintiffs to demonstrate "that age was the 'but-for' cause of their employer's adverse action." 129 S. Ct. 2343, 2351 n.4 (2009).

**1. Direct Evidence**

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir.

1998) (internal quotation marks omitted) (alterations in original). We have said that under Title VII, if a plaintiff can show direct evidence of intentional discrimination, the burden of persuasion shifts to the employer to demonstrate that it would have discharged the plaintiff even if it had not been motivated by age discrimination. *See, e.g.*, *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000).[2] Over the years, we have applied this burden-shifting framework to analyze direct evidence of discrimination claims brought outside of Title VII, including ADEA claims. *See, e.g.*, *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). In *Gross*, however, the Supreme Court specifically held that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." 129 S. Ct. at 2352. Thus, *Gross* overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination. *Gross* enunciated the correct standard for ADEA claims as whether the plaintiff has proven "by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Id.* at 2351.

Geiger alleges that his supervisor Rokicki arranged for Truemner, a younger employee, to receive training pertinent to Geiger's job and suggested that Geiger take a voluntary layoff for the duration of the training. Geiger further claims that "the word come [sic] back to [him] that Mr. Rokicki thought [he] was considering retirement and that he felt [it was] in the best interest of the Elkton business unit that he should have that role covered by a younger person." Geiger was not considering retirement and

---

[2]This thread of our case law derives from the analysis for mixed-motive employment discrimination cases approved by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) (plurality opinion). Although the mixed-motive case in *Price Waterhouse* involved direct evidence, this burden-shifting framework was intended for mixed-motive cases and not all cases involving direct evidence, as now clarified by *Gross*. 129 S. Ct. at 2352. Our court's expansive application of the burden-shifting framework was based on a misunderstanding that the framework applied to the type of evidence presented and not the type of claim brought. *See, e.g.*, *Wexler*, 317 F.3d at 585 (finding that "no *Price Waterhouse* mixed-motive analysis is warranted, because [plaintiff] failed to surmount his initial burden of proffering probative direct evidence [of] *any* impermissible age-related discriminatory motive" (emphasis in original)); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (declaring that *Price Waterhouse*'s burden-shifting framework would have applied to plaintiff's ADEA claim if he had presented direct evidence of age discrimination).

argues that Rokicki's statement and behavior constitute direct evidence of age discrimination.

Geiger has presented no evidence, however, to suggest that Rokicki was involved in the decision to hire Strong instead of Geiger.[3] Furthermore, because Geiger has not alleged that Rokicki's statement occurred in relation to the decision to terminate his employment, this conduct is not direct evidence. *Rowan*, 360 F.3d at 550 (finding that statements made by nondecisionmakers do not constitute direct evidence and are more appropriately analyzed as circumstantial evidence). In fact, there is no evidence to indicate that Rokicki's allegedly discriminatory mindset resulted in *any* adverse employment action because Geiger was ultimately allowed to attend the training session and Truemner was instead temporarily laid off for the duration of the training. We thus find that Geiger has not provided direct evidence of age discrimination. *See Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 589-90 (6th Cir. 2003) (finding that a statement by a non-decisionmaker that the vice-president "wanted younger people" was not direct evidence of age discrimination).

### 2. Circumstantial Evidence

While *Gross* specifically rejected the burden-shifting framework for claims of direct evidence, as discussed above, the Supreme Court expressly declined to decide whether the *McDonnell Douglas* test applies to the ADEA. In a footnote, the majority noted that it "has not definitively decided whether the evidentiary framework of [*McDonnell Douglas*], utilized in Title VII cases is appropriate in the ADEA context." *Gross*, 129 S. Ct. at 2349 n.2. In this circuit, however, while recognizing the differences between Title VII and the ADEA, we have long found the *McDonnell Douglas*

---

[3] Geiger argued for the first time in appellate oral argument that Rokicki played some part in the decision to terminate his employment. This argument is likely waived as he never argued that Rokicki participated in the decisionmaking either before the district court or in his appellate briefs. *See United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008). Geiger never disputed or even responded to Tower's defense, argued in Tower's briefs to the district and appellate courts, that Buycks, not Rokicki, made the decision to hire Strong. Nevertheless, even if this argument were not waived, Geiger has not presented any evidence indicating that Rokicki's statement regarding training Truemner at the Elkton facility had anything to do with Buycks's decision to hire Strong for the Clinton MRO Area position. Moreover, even if Geiger could provide evidence to suggest a link, the record clearly indicates that age was not the "but-for" factor in Tower's decision to choose Strong over Geiger. *Gross*, 129 S. Ct. at 2351.

framework useful in analyzing circumstantial evidence of ADEA claims. *See, e.g.*, *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir. 1975)). The *McDonnell Douglas* test thus remains applicable law in this circuit, *see Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008), and we are without authority to overrule prior published decisions of our court absent an inconsistent decision of the Supreme Court or an *en banc* reversal. *See Rutherford v. Columbia Gas*, _ F.3d _, 2009 WL 2253321, at *2 (6th Cir. July 30, 2009). Consequently, we find that the *McDonnell Douglas* framework can still be used to analyze ADEA claims based on circumstantial evidence. This result is in accordance with the only circuits to have addressed the issue after *Gross*. *See Milby v. Greater Phil. Health Action*, No. 08-2865, 2009 WL 2219226, at *1 (3d Cir. July 27, 2009) (continuing to apply *McDonnell Douglas* because the plaintiff "does not dispute" its application (citing *Reeves*, 530 U.S. at 142)); *Martino v. MCI Commc'ns Servs., Inc.*, No. 08-2405, 2009 WL 2224914, at *3 (7th Cir. July 28, 2009) (applying *McDonnell Douglas* without discussion).

To set forth a *prima facie* case of age discrimination using circumstantial evidence, a plaintiff must establish the four elements of the well-known *McDonnell Douglas* test: 1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005)). If the termination arises as part of a work force reduction, this court has modified the fourth element to require the plaintiff to provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990).

The threshold question is thus whether Tower terminated Geiger in the context of a work force reduction. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or

she is replaced after his or her discharge." *Id.* A person is considered replaced "only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* A person is not considered replaced when his duties are absorbed by another person "or when the work is redistributed among other existing employees already performing related work." *Id.*

Geiger claims that his termination does not constitute a work force reduction because he was replaced by Strong, who was selected as the MRO Area Buyer for the Elkton and Clinton facilities. Because Geiger was formerly the MRO Buyer for the Elkton facility, he argues that she replaced him. However, Strong was selected to perform Geiger's former duties in addition to her former duties as the MRO Buyer for the Clinton facility. Strong thus did not replace Geiger but was hired to perform both his duties and her own. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 785-86 (6th Cir. 2007); *Barnes*, 896 F.2d at 1465 ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties."); *Wilson v. State of Ohio, Dep't of Job & Family Servs.*, 178 F. App'x 457, 465 (6th Cir. 2006) (finding that a combination of two positions into one "clearly does not meet the definition of replacement"); *Spencer v. Hilti, Inc.*, 116 F.3d 1480, 1997 WL 359094, at *5 (6th Cir. 1997) (table) ("It is clear . . . that we were attempting in *Barnes* to distinguish between the replacement of an employee and situations where there was a consolidation of jobs designed to eliminate excess worker capacity."). Furthermore, the record indicates that Strong did not perform all of Geiger's former duties because she was working out of the Clinton plant. Many of Geiger's responsibilities at the Elkton plant have been absorbed by hourly employees at the Elkton plant. *See Barnes*, 896 F.2d at 1465 (finding that a person has not been replaced when his work is redistributed among other existing employees). We therefore conclude that Geiger was not replaced by Strong and was terminated as part of a reduction in force.[4]

---

[4] Geiger claims that he was the only employee terminated as a result of the consolidation process. To support this claim, he submitted a spreadsheet indicating that he was the only employee discharged in the month of November. However, this same spreadsheet also lists the reductions from September through November and shows that another employee was laid off the previous month. Truemmer is not listed at all, as he was discharged in February. Significantly, the list does not appear to be complete because it does not list Strong as an employee, nor any of the other MRO Area Buyers. Without more information, Geiger

Because his discharge and failure to be re-hired arose from a work force reduction, Geiger must meet a heightened standard to establish a *prima facie* case. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 592-93 (6th Cir. 2006). It is undisputed that Geiger has presented evidence to establish the first three elements of the *McDonnell Douglas* test. First, he was 62 years old when he was terminated and clearly falls within the protection of the ADEA. *See, e.g.*, *Barnes*, 896 F.2d at 1465. Second, he was terminated from his employment with Tower. Third, he was qualified to be MRO Area Buyer for Elkton and Clinton because he had already served as MRO Buyer for Elkton, had 27 years of experience, and had received positive reviews from Tower. Tower selected Strong, who was 33 years old and outside the protected class. However,"because the most common legitimate reason for the discharge of a plaintiff in a [reduction in force] situation is the work force reduction, the plaintiff must provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Brune & Ashing v. Basf Corp.*, 234 F.3d 1267, 2000 WL 1597908, at *3 (6th Cir. 2000) (table) (quoting *Barnes*, 896 F.2d at 1465). "'The guiding principle [in a work force reduction case] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age.'" *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767-68 (6th Cir. 2004) (quoting *Barnes*, 896 F.2d at 1466).

In sum, Geiger offers the following as circumstantial evidence of discrimination against him: 1) Rokicki's comments that he wanted a younger person to attend training; 2) Rokicki's comments that age discrimination was a concern in terminating Geiger; 3) Rokicki's email that they were "doomed"; 4) Buycks's draft documents and other actions indicating that Strong had been chosen for the position of MRO Area Buyer before Strong or Geiger had been interviewed; 5) the manipulation of an email from Kreuter; and 6) Moorman's comment that listing Geiger's status as laid off was a "boo-boo."

---

has not refuted the overwhelming evidence in the record that the consolidation process was part of a reduction in force.

First, as mentioned above, Rokicki's comments about Geiger's retirement are not pertinent because Geiger has not presented any evidence to show that Rokicki was involved in the decision to hire Strong or terminate Geiger. The record indicates that Rokicki was not involved in the brainstorming sessions, did not interview Geiger, was not consulted about Geiger's qualifications, was not copied on the correspondence about offering the position to Strong, and by contrast, fought against the consolidation process and wrote emails to the human resources department expressing his anger over the way in which Geiger's employment was terminated. *See Brown*, 338 F.3d at 589-90.

Second, Geiger claims that Rokicki's documented concern about a possible age discrimination suit constitutes evidence of age discrimination. When Rokicki learned that Geiger was listed as a candidate for reduction, he expressed his concern to Buycks that Geiger could bring an age discrimination claim. The MRO Centralization Meeting notes summarize Rokicki's statements as follows: "Ray Geiger has been identified as potential [reduction in force]. [Rokicki] is concerned with age discrimination issue he will follow up with [human resources]." Rokicki explained that his statements stemmed from his prior experience with layoffs and his concern that proper procedures be followed in terminating Geiger. Looking at the facts in the light most favorable to Geiger, and assuming that Rokicki's concern was instead motivated by animus against older employees, Rokicki's statements about a possible age discrimination suit still do not constitute evidence of age discrimination because he was not the one making the hiring decision. Buycks decided to hire Strong, without any input from Rokicki, and Geiger has offered no evidence that Buycks was concerned about an age discrimination suit.

Similarly, Rokicki's email that they were "doomed" is not evidence that Buycks discriminated against Geiger on account of age. In response to an email from Cannon about Geiger's termination, Rokicki stated, "Just a FYI. I'm still sticking with the Friday plan [to terminate Geiger], although [Geiger] will probably be fishing for info from me later today. . . . P.S. I just cannot shake this feeling that we're doomed!" Rokicki stated that his comment was due to the fact that he did not think that the MRO

Buyer positions should have been consolidated. The record supports the fact that Rokicki was not in favor of the consolidation; but even if his feeling "doomed" was solely on account of Geiger's termination, this is not evidence that Geiger was terminated on account of his age.

Next, Geiger claims that Buycks selected Strong without considering him for the position. As evidence, Geiger submitted documents that list Strong as the MRO Area Buyer that were drafted before his interview for the position. He also alleges that Strong was personally contacted and encouraged to apply, in contrast to the fact that no one contacted him. Nevertheless, Geiger's supervisor Murphy helped Geiger apply,[5] and he was interviewed by Cannon for the position. The record supports Geiger's claim that Buycks preferred Strong as a candidate for the position. Indeed, he offered her the job instead of Geiger. However, Buycks's preference for Strong is not actionable unless it was motivated by discriminatory animus. *See Browning v. Dep't of the Army*, 436 F.3d 692, 696-97 (6th Cir. 2006) ("[T]he employer's motivation, not the applicant's perceptions, or even an objective assessment [] of what qualifications are required for a particular position, is key to the discrimination inquiry." (internal quotation marks omitted)); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates."). Because Geiger has failed to present evidence that Buycks terminated or refused to hire Geiger on account of his age, he cannot establish that Buycks's preference for Strong is discriminatory.

Next, Geiger points to the alteration in Kreuter's email that distorted the language of the email to make the MRO Area Buyer selection process seem more fair. The email Geiger initially received in discovery stated, "Al, you should plan to contact the current plant MRO Buyers to make sure they are aware of and apply for the positions and talk with them personally about the role." However, the original email stated, "Al,

---

[5]The parties dispute whether Geiger actually submitted an application to be MRO Area Buyer. Tower claims that there is no electronic record of his application. This factual dispute is of no consequence in this case because the record indicates that Geiger was interviewed and considered for the job, regardless of whether his application was received.

you should plan to contact those MRO buyers *that you want* to make sure apply for the positions and talk with them personally about the role" (emphasis added). Although this alteration is undeniably suspicious, it is ultimately irrelevant because there is no evidence that Strong was hired or that Geiger was discharged on account of age. Furthermore, Geiger has offered no proof to show that Kreuter participated in the decisions to choose Strong or terminate Geiger. *See Rowan*, 360 F.3d at 550.

Lastly, Geiger claims that Moorman's testimony is indicative of the fact that a mistake was made in terminating him. In her deposition, Moorman was asked why a document generated after Geiger's termination had him listed as "laid off." She responded, "I maybe made a boo-boo." Geiger claims that the "boo-boo" was his discharge from Tower. Upon closer reading, however, it is clear that Moorman's response refers to the fact that the document she created listed Geiger as having been "laid off," and thus subject to recall for future employment, instead of "terminated." The "boo-boo" was that she meant to categorize Geiger's employment as terminated. Moreover, Geiger's interpretation of this exchange is illogical given that five lines down from this statement, Moorman stated that she did not even know who made the decision to terminate Geiger. Her "boo-boo" could not have been discharging Geiger because she had nothing to do with the decision.

Because Geiger has failed to provide additional evidence that he was terminated or not hired on account of his age, as required by the heightened standard for work force reduction cases, *Barnes*, 896 F.2d at 1465, we find that Geiger has not established a *prima facie* case of age discrimination.

Furthermore, even if we were to assume that the evidence Geiger presented met the heightened standard and established a *prima facie* case of age discrimination, Geiger nevertheless has not established that Tower's stated reason – a reduction in force from 21 employees to 6 – was pretext and that age was the real reason for Geiger's termination. The record indicates that Tower chose the better worker when it hired Strong for one of the few consolidated positions that covered Geiger's and others' former responsibilities. Because Geiger has not presented evidence that Tower's

legitimate, non-discriminatory reason was pretextual, we find that the district court correctly granted summary judgment to Geiger on his ADEA claim.

**B.     ELCRA**

Geiger also claims that his termination violates the ELCRA.  The ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a).  ELCRA claims are analyzed under the same standards as federal ADEA claims. *See Blair*, 505 F.3d at 523 (analyzing ADEA and ELCRA claims "together" under the same standards in a work force reduction case). Because Geiger has failed to present evidence sufficient to establish the elements of an ADEA claim, he has similarly failed to establish a *prima facie* case under the ELCRA. Because we find that Geiger has not established a claim under the ELCRA, we need not address Tower's arguments that Geiger's ELCRA claims are time-barred.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Tower.

---

## CONCURRING IN THE RESULT

---

ROGERS, Circuit Judge, concurring. I concur in the result, but would base affirmance on Geiger's not having shown pretext, even assuming that Geiger had made out a prima facie case of age discrimination.